UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
| | : | |
| v. | : | |
| | : | |
| ALEX MELENDEZ | : | No.  05-44-7 |

Gene E.K. Pratter, J.               Memorandum and Order          December 9, 2005

Defendant Alex Melendez moves to preclude the admission of in-court and certain allegedly suggestive out-of-court identifications in this criminal case.  After hearing evidence with respect to the motion, and for the reasons discussed below, the motion will be denied.

**FACTS AND PROCEDURAL BACKGROUND**

Alex Melendez is charged with eight separate counts in this case, including conspiracy to participate in a RICO enterprise, conspiracy to distribute heroin within 1000 feet of a public elementary school, kidnaping in aid of racketeering and conspiracy to commit kidnaping in aid of racketeering.  As the indictment delineates, the charges against Mr. Melendez include his alleged involvement with a group calling itself the "Latin Kings."  In alleged association with that group (or other members of the group), Mr. Melendez is charged with, among other things, kidnaping Rafael Guzman.  Mr. Guzman ultimately escaped from his captors and identified Mr. Melendez as one of his abductors from a photo array.  It is this identification, in addition to any in-court identification that may be made by Mr. Guzman, that Mr. Melendez seeks to exclude from any trial in this case.

At the hearing on the motion, testimony was taken from two witnesses, Mr. Guzman and Special Agent Robert M. Stewart.  At the time of the abduction, Mr. Guzman was a member of

1

the Latin King group based in Vineland, New Jersey, a group competing in some respects with the Philadelphia Latin King group.  Hearing Trans. at 10:20-25; 11:1-12; 52:7-18.  Mr. Guzman testified that in the early morning hours of December 23, 2003, two men knocked on the door of his home and entered the home at gunpoint.  Hearing Trans. at 53:8-22; 59:8-15.  A third man, who also had a gun and had been standing off to the side of the home, also entered the house.  Hearing Trans. at 59:10-11.  Although Mr. Guzman recognized two of the gunmen as Latin Kings from the Philadelphia group, he did not recognize the third person, who he described as a light-skinned, short, Hispanic male wearing a black bullet proof vest and carrying a gun.  Hearing Trans. at 55:3-24; 78:15-16.  This third man is the one who was later identified as Mr. Melendez.

The gunmen allegedly told Mr. Guzman that they needed to talk to him and asked him to step outside.  Hearing Trans. at 53:17-18.  After Mr. Guzman complied with this request, he was led to a car that he recognized as belonging to another Vineland-based Latin King who had been abducted the previous evening.  Hearing Trans. at 56:4-21.  Mr. Guzman was told to get into the car and alleges that when he resisted, Mr. Melendez pointed the gun at his head and told him to get in.  Hearing Trans. at 56:24-25; 1-3.  Mr. Guzman was placed in the backseat of the car behind the driver, and the person alleged to have been Mr. Melendez was sitting in the front seat on the passenger side.  Hearing Trans. at 57:11-12.

Once in the car, the abductors allegedly drove Mr. Guzman to Philadelphia, a trip that took about 45 minutes.  Hearing Trans. at 59:20; 60:11-16.  During the drive, according to Mr. Guzman, Mr. Melendez turned around from the front seat, faced him and threatened to kill him.  Hearing Trans. at 58:2-10.  Mr. Guzman testified that he was able to see this particular abductor's face clearly.  Hearing Trans. at 58:11-23.

When they arrived at a North Philadelphia row home, Mr. Guzman states that he was taken to the basement of the home, where his three abductors were joined by two other Philadelphia Latin Kings, both of whom Mr. Guzman knew. Hearing Trans. at 60:25; 61:1, 18-21. Mr. Guzman testified that the basement was lighted and he could see the people who were there. Hearing Trans. at 66:2-6.

Mr. Guzman testified that he was told to remove his clothing, and when he resisted, was again threatened with the gun by the man he later identified to be Mr. Melendez. Hearing Trans. at 61:8-13. According to Mr. Guzman, the five men, including Mr. Melendez, repeatedly beat him for approximately the next seven hours. Hearing Trans. at 62:1-15; 65:12-21; 81:16-24. Mr. Guzman testified that he never lost consciousness during the beating. Hearing Trans. at 82:19-21. After the beating was over, four of the men left the home and the one person who remained in order to guard Mr. Guzman fell asleep. Hearing Trans. at 64:2-8. Mr. Guzman asserts that he reclaimed his clothing and ran from the home to a furniture shop in the area where he asked for help in getting an ambulance to take him to the hospital. Hearing Trans. at 64:19-25; 65:1-8.

Mr. Guzman testified that while he was in the hospital, he was contacted by a police officer from the Philadelphia Police Department and also by Special Agent Stewart of the FBI. Hearing Trans. at 67:6-17; 73:13-16. A photo array consisting of six photos was shown to Mr. Guzman on April 20, 2004. Hearing Trans. at 14:13-17. Special Agent Stewart was the agent who presented the photo array to Mr. Guzman from which Mr. Guzman identified Mr. Melendez. Hearing Trans. at 14:16-17.[1] Agent Stewart testified that he arranged for the preparation of the

---

[1] Agent Stewart also testified that he presented three photo arrays separately to Mr. Guzman, each of which contained a photo of one of three suspected abductors. Hearing Trans. at 14:3;15:9-22; 19:8-9. Mr. Guzman identified two other of his abductors from the remaining

photo array to contain six photographs, one of which was a photo of Mr. Melendez. Hearing Trans. at 13:15-19. A color copy of the array was provided to the Court at the hearing, and the Court notes that each of the photos included in the array was of an Hispanic male with features similar to those of Mr. Melendez.

Agent Stewart, who stated that he had approximately fifteen years of prior law enforcement experience that included the presentation of photo arrays to victims, testified that, other than telling Mr. Guzman that the photo panels may or may not contain photos of his abductors, he made no statement to Mr. Guzman about the photographs. Hearing Trans. at 6:15-18, 25; 7:1-2. Agent Stewart further testified that when Mr. Guzman was shown the photo array that contained Mr. Melendez's photograph, Mr. Guzman identified the photo of Mr. Melendez as the abductor he had not previously known. Agent Stewart also stated that Mr. Guzman made the identification within 10 to 15 seconds of looking at the array. Hearing Trans. at 15:25; 16:1-2. Mr. Guzman corroborated this testimony by asserting that he had been able to identify Mr. Melendez from the array almost instantly. Hearing Trans. at 68:11-18.

Mr. Melendez now moves to suppress Mr. Guzman's identification of him from the photo array, as well as any in-court identification of him by Mr. Guzman.[2] Mr. Melendez asserts that the photo identification made by Mr. Melendez was unduly suggestive and that the admission of any such identification will deny him a fair trial.

**DISCUSSION**

---

photo arrays. Hearing Trans. at 19:12-18; 68:11-12.

[2] Mr. Melendez filed two motions to suppress evidence, docketed as numbers 285 and 288. However, because these motions appear to be identical, they are treated as the same motion here.

A district court has broad discretion to determine the admissibility of relevant evidence in response to an objection under Federal Rule of Evidence 403. U.S. v. Balter, 91 F.3d 427, 442 (3d Cir.1996). In ascertaining whether an out-of-court photo identification is inappropriately suggestive, "the primary evil to be avoided is 'a very substantial likelihood of . . . misidentification.'" Neil v. Biggers, 409 U.S. 188, 198 (1972). When evaluating a government identification procedure to determine whether the procedure was constitutionally sound, a court must first consider whether the procedure was "unnecessarily suggestive," and, if so found, whether the suggestiveness of the procedure created a "substantial risk of misidentification." United States v. Emanuele, 51 F.3d 1123, 1128 (3d Cir. 1995) (citations omitted). The Court of Appeals for the Third Circuit has emphasized that "reliability is the linchpin in determining the admissibility of identification testimony," even where the procedure used is found to have been suggestive. Manson v. Braithwaite, 432 U.S. 98, 105 (1977).

The Supreme Court has found that unnecessary suggestiveness, absent a substantial likelihood of misidentification, is not sufficient to warrant suppression. Biggers, 409 U.S. at 199 ("[t]he purpose of a strict rule barring evidence of unnecessarily suggestive confrontations . . . would not be based on the assumption that in every instance the admission of evidence of such a confrontation offends due process"). For example, in United States v. Mathis, 264 F.3d 321, 331 (3d Cir. 2001), the court found that the fact that the witness identifying the suspect as a bank robber had seen the identical photo of the defendant in a photo array one month before the robbery in question was not unduly suggestive, but rather affected the weight of the evidence, an issue that properly could be argued to the jury.

A district court must assess whether a suggestive identification is reliable in light of the totality of the circumstances of the case. Biggers, 409 U.S. at 199; Emanuele, 51 F.3d at 1128. In evaluating the likelihood of misidentification, a district court should consider and weigh the following factors: (1) the opportunity of the witness to view the perpetrator at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation. Manson, 432 U.S. at 114; Biggers, 409 U.S. at 199-200. These factors must be weighed and balanced against each other in making such a determination.[3]

In this case, the Court finds that there is no evidence that the photo array presented to Mr. Guzman from which he identified Mr. Melendez was unnecessarily suggestive such that there is a substantial likelihood of misidentification here. Having had an opportunity to review a copy of the photo array itself, the Court concludes that the photos presented to Mr. Guzman were of similar size and composition and that the individuals depicted therein had features of sufficient similarity to each other and to Mr. Melendez such that the array itself cannot be found to be suggestive.[4]

---

[3] For example, in United States v. Lawrence, 349 F.3d 109, 113 (3d Cir. 2003), the court found that a photo array in which the defendant's photo was the only one that was not a "mug shot" and the defendant was the only person not wearing a shirt and who was smiling was not impermissibly suggestive in light of the fact that the individuals in the array had "reasonably similar facial features and characteristics," that each of the identifying witnesses had an unobstructed opportunity to view the defendant without distraction, and both witnesses knew the defendant before the shooting. Thus, the Lawrence court found the likelihood of misidentification from undue suggestiveness to be remote. Id.

[4] The Court notes that at the hearing, although counsel for Mr. Melendez argued that Mr. Melendez "looked younger" than all of the other individuals depicted in the array, Mr. Guzman

Additionally, even if the array was suggestive (which it is not), the Court concludes that after applying the considerations delineated in Manson to the present circumstances, Mr. Guzman's selection of Mr. Melendez's photograph is sufficiently reliable for such evidence to be presented to a jury.[5] Because Mr. Guzman spent nearly eight hours with his abductors, many in a lighted basement in which he could see his attackers, and was repeatedly threatened by the particular abductor later identified as Mr. Melendez, Mr. Guzman had a sufficient view of his abductors prior to making the identification. There is no evidence that Mr. Melendez lost

---

testified that he recalled no such distinction. Hearing Trans. at 76:4-5. (At the hearing, both counsel strategically chose not to show Mr. Guzman the photo array he had been shown in April 2004.) Mr. Guzman's recollection of the array is not an unjustified one. Mr. Melendez's counsel's additional criticism that the lighting shown in the photographs made all of the individuals looked "like they all have suntans" does not suffice to introduce suggestiveness because if *all* of the individuals looked that way, then no *one* individual would be likely to attract undue attention. Hearing Trans. at 28:23-25. Finally, in a supplemental memorandum filed by counsel for Mr. Melendez, counsel focuses on differences in the amount of hair and hair style Mr. Melendez had at the time of the alleged beating versus that which was depicted in the photo array. The Court does not find this argument persuasive, however, because Mr. Guzman acknowledged the difference ("[in] the picture they showed me he had a lot more hair"), and noted that despite this difference, he was still able to identify Mr. Melendez. Hearing Trans. at 75:15-17.

[5] In a supplemental memorandum, counsel for Mr. Melendez notes that the Court of Appeals for the Third Circuit, in Emanuele, advised that an eyewitness identification procedure must be more carefully weighed "if there is not other indicia of the defendant's guilt, such as material evidence," and argues that because there was no other evidence of Mr. Melendez's guilt than Mr. Guzman's testimony offered at the hearing, the reliability of the procedure underlying the photo array must be closely scrutinized. Supplemental Memo at 2. The Court notes that the Government does not bear the burden of proving Mr. Melendez's guilt at a hearing addressing the admissibility of a particular photo identification, but rather need only prove that the photo array was not suggestive and did not create a substantial risk of misidentification. Having reviewed the evidence presented at the hearing, including the testimony of Agent Stewart with respect to the manner in which the photo array was compiled and presented, and the actual photo array itself, the Court is satisfied that the photo array was neither suggestive nor presented in a suggestive manner. Thus, additional evidence with respect to the guilt or innocence of Mr. Melendez was not necessary, or appropriate under the circumstances.

consciousness during the beating or was otherwise distracted,[6] thereby establishing that he was sufficiently attentive. Mr. Guzman's basic description of Mr. Melendez, as a light-skinned short Hispanic male, although quite general in terms, is an accurate description of Mr. Melendez's general features. Mr. Guzman was also able to identify Mr. Melendez from the photo array very quickly and without reservation. Finally, the four months that passed between the abduction and the identification are not unduly long given the circumstances here, where Mr. Guzman experienced the memorable events of being abducted and held for nearly eight hours with his attackers.

Despite the various attacks on Mr. Guzman and Agent Stewart's credibility that were launched by counsel for Mr. Melendez at the hearing, the Court concludes that those arguments would go to the weight, and not the admissibility, of the identification evidence, and, as such, those arguments are for a jury, and not the Court, to evaluate.

### CONCLUSION

Based on the facts and circumstances of this case, the Court concludes that there is nothing about the actual photo array that is unnecessarily suggestive, there is no evidence that Agent Stewart or any other law enforcement officer encouraged or manipulated Mr. Guzman to select Mr. Melendez, and there is no evidence that the conditions under which the identification was made were prejudicial in any way. Moreover, Mr. Guzman's experiences with his abductors

---

[6] At the hearing, counsel for Mr. Melendez suggested that Mr. Guzman's focus on the gun being pointed at him might have distracted Mr. Guzman's attention from his attackers' faces. Hearing Trans. at 78:12-16. However, given the sheer span of time that Mr. Guzman spent with his attackers, the Court concludes that it is highly unlikely that Mr. Guzman stared at the gun the entire time, but was able to, and likely did, as he testified, look at his attackers as well.

suggest that his identification was sufficiently reliable. For these reasons, the Court concludes that the there is no substantial risk of misidentification, and the motion will be denied with respect to both the in-court and out-of-court identifications of Mr. Melendez. An appropriate Order follows.

_____

Gene E.K. Pratter
United States District Judge

December 9, 2005

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **ALEX MELENDEZ** | : | **No.  05-44-7** |

### O R D E R

**AND NOW**, this ___ day of December, 2005, upon consideration of the Defendant Alex Melendez's Motion to Suppress Evidence of In Court and Out of Court Identifications (Docket Nos. 285, 288), the response thereto (Docket No. 293) and after a hearing attended by Defendant Alex Melendez on the Motion, it is **ORDERED** that the Motion is **DENIED**.

BY THE COURT:

_____
GENE E.K. PRATTER
United States District Judge